FILED IN
COURT OF CRIMINAL APPEALS

November 2, 2015

ABEL ACOSTA, CLERK

PD-0292-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 11/2/2015 12:04:39 PM
Accepted 11/2/2015 12:17:07 PM
ABEL ACOSTA
CLERK

# NO.  PD-0292-15

## IN THE

# COURT OF CRIMINAL APPEALS

# OF THE STATE OF TEXAS

# JENNIFER BANNER WOLFE,
## APPELLANT
## V.
# THE STATE OF TEXAS,
## APPELLEE

### *APPELLANT'S BRIEF*
*Oral Argument Requested*

**02-12-00188-CR**
**IN THE SECOND COURT OF APPEALS**
**AT FORT WORTH**

On appeal from Cause Number 1200447D
in 213th District Court of Tarrant County, Texas
Honorable Louis Sturns, Judge Presiding

**DAVID A. PEARSON, P.L.L.C.**
**State Bar No. 15690465**
**Attorney at Law**
**222 W. Exchange Ave., Ste. 103**
**Fort Worth, Texas 76164**
**(817) 625-8081**
**(817) 625-8038 (Fax)**
*david@lawbydap.com*
**ATTORNEY FOR APPELLANT**

# LIST OF PARTIES AND COUNSEL

MS. JENNIFER BANNER WOLFE               APPELLANT
    TDCJ #01776755
    Lockhart Work Facility
    P.O. Box 1170
    Lockhart, TX 78644

HONORABLE DAVID A. PEARSON, IV      ATTORNEY FOR APPELLANT
    222 W. Exchange Ave., 103              (APPEAL)
    Fort Worth, TX  76164

HONORABLE LISA MULLEN              ATTORNEY FOR APPELLANT
    1214 Fairmount                    (TRIAL)
    Fort Worth, TX 76104

HONORABLE ROSE ANNA SALINAS      ATTORNEY FOR APPELLANT
    1214 Fairmount                    (TRIAL)
    Fort Worth, TX 76104

HON. SHAREN WILSON                  DISTRICT ATTORNEY
    401 W. Belknap St.               TARRANT COUNTY, TX
    Fort Worth, TX 76196

HONORABLE TANYA S. DOHONEY       ASST. DISTRICT ATTORNEY
    401 W. Belknap St.               TARRANT COUNTY, TEXAS
    Fort Worth, TX 76196

HONORABLE KIM D'AVIGNON          ASST. DISTRICT ATTORNEY
    401 W. Belknap St.               TARRANT COUNTY, TEXAS
    Fort Worth, TX 76196

HONORABLE KEVIN BONEBERG        ASST. DISTRICT ATTORNEY
    401 W. Belknap St.               TARRANT COUNTY, TEXAS
    Fort Worth, TX 76196

HONORABLE LOUIS STURNS      JUDGE PRESIDING
401 W. Belknap St.      213TH CRIMINAL
Fort Worth, TX 76196      DISTRICT COURT
     TARRANT COUNTY, TX

# SUBJECT INDEX

List of Parties and Counsel ...................................................................................i

Subject Index ..................................................................................... iii

Index of Authorities.................................................................................iv

Statement Regarding Oral Argument ......................................................1

Statement of the Case ...............................................................................2

Statement of Procedural History.............................................................2

Grounds for Review.................................................................................3

Statement of Facts....................................................................................3

Summary of Argument.............................................................................7

Arguments and Authorities:

    *Ground for Review One*:
    Whether the Court of Appeals wrongly decided that the Appellant's
    point of error that the trial court abused its discretion by admitting
    unreliable expert testimony of abusive head trauma based solely on a
    constellation of symptoms did not fairly include the issue whether the
    expert testimony was unreliable given this specific injured party's
    history. .................................................................................................8

    *Ground for Review Two*:
    Whether the Court of Appeals wrongly decided that the trial court did
    not abuse its discretion by admitting unreliable expert testimony of
    abusive head trauma based solely on a constellation of symptoms. ............15

Prayer for Relief.................................................................................28

-iii-

Certificate of Service ........................................................................................28

Certificate of Compliance ................................................................................29

# LIST OF AUTHORITIES

Cases                                                           Page

*Cavazos v. Smith*, 132 S.Ct. 2 (2011) ...................................................................27

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 572 (1993) .............9, 25

*Ellison v. State*, 201 S.W.3d 714 (Tex. Crim. App. 2006) ..................................20

*Ex parte Henderson*, 384 S.W.3d 833 (Tex. Crim. App. 2012) ................ 22, 23, 24

*Ex parte Robbins*, 360 S.W.3d 446 (Tex. Crim. App. 2011), *cert denied*, 2012 U.S. LEXIS 3468 (U. S., May 14, 2012) ...................................................................24, 25

*Ex parte Robbins,* 2014 Tex. Crim. App. LEXIS 2014 (Tex. Crim. App., November 26, 2014) (Johnson, J., concurring), *rehearing granted,  In re Robbins*, 2015 Tex. Crim. App. LEXIS 567 (Tex. Crim. App., May 13, 2015) ...................18

*Gallo v. State*, 239 S.W.3d 757 (Tex. Crim. App. 2007), *cert denied*, 128 S. Ct. 2872 (2008) ........................................................................................................20

*Hailey v. State*, 87 S.W.3d 118 (Tex. Crim. App. 2002) .........................................13

*Lankston v. State*, 827 S.W.2d 907 (Tex. Crim. App. 1992) .................................13

*Perry v. Cohen*, 272 S.W.2d 585 (Tex. 2008) .......................................................14

*State v. Bailey*, 201 S.W.3d 739 (Tex. Crim. App. 2006) .................................13, 14

*State v. Copeland*, 2014 Tex. Crim. App. Unpub. LEXIS 929, No. PD-1802-13 (Tex. Crim. App. 2014) (not designated for publication) .....................................13

*State v. Edmunds*, 746 N.W.2d 590 (Wis. Ct. App. 2008), *rev. denied*, 749 N.W.2d 663 (Wis. 2008) .......................................................................................................25

*State v. Mercado*, 972 S.W.2d 75 (Tex. Crim. App. 1998)  .................................13

*State v. Schoonmaker*, 176 P.3d 1105 (N. M. 2008), *overruled in part*, 332 P.3d 850 (N. M. 2014) ....................................................................................26

Constitutions, Rules, Statutes

TX. R. APP. P. 38.1(i) ...........................................................................10, 13

TEX. R. EVID. 702..............................................................................7, 9, 20

TEX. R. EVID. 705...................................................................................7, 9

Secondary Sources

Bandak*, Shaken Baby Syndrome: A Biomechanics Analysis of Injury Mechanisms*, 151 Forensic Sci. Int'l 71 (2005) ..........................................................27

Brandon J. Garrett & Peter J. Neufeld, *Invalid Forensic Science Testimony and Wrongful Convictions*, 95 VA. L. REV. 1, 12 (2009) ......................................21

Deborah Tuerkheimer, *The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts,* 87 WASH. L. REV. 5 (2009) .......................................22

*DNA Exoneree Case Profiles*, INNOCENCE PROJECT, http://innocenceproject.org/know/..........................................................20

Minns, *Shaken Baby Syndrome: Theoretical and Evidential Controversies*, 35 J. Royal College of Physicians of Edinburgh 5, 10 (2005) .................................27

NATIONAL ACADEMY OF SCIENCES STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD 112 (2009) ("NAS Report), note 4; Daniel G. Orenstein, *Comment: Shaken to the Core: Emerging Scientific Opinion and Post-Conviction Relief in Cases of Shaken Baby Syndrome*, 42 ARIZ. ST. L.J. 1305 (2010) ........................................................24

Sabra Thomas, *Addressing Wrongful Convictions: An Examination of Texas's New Junk Science Writ and Other Measures for Protecting the Innocent*, 52 Hous. L. Rev. 1037 (Winter 2015) .................................................................21

Steven C. Gabaeff, M.D., *Challenging the Pathophysiologic Connection between Subdural Hematoma, Retinal Hemorrhage and Shaken Baby Syndrome*, West J Emerg. Med. 2011; 12(2) May 144-158................................................17

Uscinski, *Shaken Baby Syndrome: An Odyssey*, 46 Neurol. Med. Chr. (Tokyo) 57,59 (2006) ....................................................................27

Vinchon M, Delestret I, DeFoort-Dhellemmes S, et al. *Subdural Hematoma in Infants: Can It Occur Spontaneously? Data From a Prospective Series and Critical Review of the Literature*: Child Nerv Syst. 2010......................................17

# NO. PD-0292-15

## IN THE

# COURT OF CRIMINAL APPEALS

## OF THE STATE OF TEXAS

---

# JENNIFER BANNER WOLFE,
## APPELLANT
## V.
# THE STATE OF TEXAS,
## APPELLEE

---

## *APPELLANT'S BRIEF*

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

COMES NOW, Jennifer Banner Wolfe, hereinafter referred to as the Appellant, by and through her attorney of record, DAVID A. PEARSON, IV, and respectfully files her brief in the above numbered cause, pursuant to the rules of the Court.

## STATEMENT REGARDING ORAL ARGUMENT

The Court gave notice on 16 September 2015 that oral argument will be

permitted. The Appellant believes oral argument would be helpful to the Court's consideration of the issues in this case.

## STATEMENT OF THE CASE

The Appellant was charged by indictment with Injury to a Child, Elderly or Disabled, Serious Bodily Injury. (3 R. R. 10) (C. R. 10-11) The State and Appellant waived a jury trial. The State waived paragraphs one through three of the indictment, and proceeded on paragraph four plus the deadly weapon notices. (C. R. 2-3) (3 R. R. 9) The Appellant entered a not guilty plea. (3 R. R. 9-11) Following a bench trial the trial court found the Appellant guilty. (C. R. 268, 274-76) (8 R. R. 4) Following a brief sentencing hearing the trial court assessed the punishment at 5 years in the Texas Department of Criminal Justice – Institutional Division. (C. R. 274-76, 281) (8 R. R. 42-43) The trial court certified that the Appellant had the right to appeal. (C. R. 277) Appellant timely filed notice of appeal on 2 May 2012. (C. R. 278)

## STATEMENT OF PROCEDURAL HISTORY

In a published opinion dated 26 February 2015, the Court of Appeals affirmed, with one Justice dissenting, the judgment of the trial court. *Jennifer*

*Banner Wolfe v. State*, 459 S.W.3d 201 (Tex. App.—Fort Worth 2015, pet. granted) (Walker, J., dissenting). Neither party filed a motion for rehearing. Pursuant to one extension granted by this Court, the Appellant's Brief is timely if filed on or before 2 November 2015.

## GROUNDS FOR REVIEW

### Ground for Review No. 1

Whether the Court of Appeals wrongly decided that the Appellant's point of error that the trial court abused its discretion by admitting unreliable expert testimony of abusive head trauma based solely on a constellation of symptoms did not fairly include the issue whether the expert testimony was unreliable given this specific injured party's history.

### Ground for Review No. 2

Whether the Court of Appeals wrongly decided that the trial court did not abuse its discretion by admitting unreliable expert testimony of abusive head trauma based solely on a constellation of symptoms.

## STATEMENT OF FACTS

Joseph Bruce Casseaux, a paramedic at Medstar, received a call from dispatch to go to a single-family home at 10:22 a.m. on April 1, 2010. When he arrived, a firefighter was doing CPR on a very small child ("Jack").[1] Mr. Casseaux was told that the child had choked on some food because the child was

---

[1] To protect the anonymity of the child at issue, the Court of Appeals used aliases to refer to him and his mother.

crying and screaming and just fell back unconscious. The child was blue, indicative of low blood circulation. There was no spontaneous respiration, so the child was clinically dead. (4 R. R. 11-15) Mr. Casseaux continued CPR and started advanced life support. On the ride to Cook Children's Medical Center, the child began to have spontaneous respirations. (4 R. R. 16-17) The child had no bruising, no physical signs of injury, and no injury on his head or face. (4 R. R. 31)

Months before, Mrs. "Smith", Jack's mom, interviewed Jennifer Wolfe for in-home child-care for Jack. Mrs. Smith chose someone off a website with a list of state certified providers. (4 R. R. 34, 38-39) Mr. and Mrs. Smith decided to hire Ms. Wolfe. (4 R. R. 42) At seven months old, Jack could sit if he was propped up, then he would go to one side or the other. (4 R. R. 46)

Mrs. Smith dropped Jack off at Ms. Wolfe's house on April 1, 2010. (4 R. R. 55) At about 10:40 a.m. Ms. Smith received a call at school. The fireman on the phone told her she needed to go to Cook Children's Medical Center. (4 R. R. 59) Ms. Wolfe told Mrs. Smith that Jack had eaten, was crying, so she set him down, and he fell backward. (4 R. R. 61) Physicians treating Jack determined that they needed to do surgery due to bleeding in his brain. (4 R. R. 63) Jack was in Cook Children's Hospital for nine days. The side of his head, where he had

surgery, was very swollen, and he could not move his right side. (4 R. R. 65)

Brandy Pollifrone, an employee of the Texas Department of Human Services, worked with child-care licensing and conducted abuse and neglect investigations. (4 R. R. 103) Ms. Pollifrone was assigned to this case involving in-home day care provided by Ms. Wolfe. (4 R. R. 105) Because Ms. Wolfe was with Jack when he became symptomatic, (4 R. R. 112), Ms. Pollifrone went to Ms. Wolfe's home to investigate. (4 R. R. 114) Ms. Wolfe explained to Ms. Pollifrone that Jack arrived at 7:15 a.m., had breakfast, and she put him down for a nap. Jack woke up from the nap earlier than usual and was fussy, so she tried to calm him. Ms. Wolfe received a text that her daughter was sick at school, so she loaded up the children and drove to pick up her daughter. She returned home at about 10:05 a.m. Ms. Wolfe set Jack down on the floor and went to get another child out of the car seat. Jack fell back, crying, and Ms. Wolfe picked him back up. Ms. Wolfe told him that he needed to sit. (4 R. R. 118-119) Jack fell back again, and then he went quiet. Ms. Wolfe walked up to him and realized that Jack was limp. (4 R. R. 122) Ms. Pollifrone determined from her investigation that Jack was not sitting up on his own at that time. (4 R. R. 123)

Chelsea Adams, a friend of Ms. Wolfe, remembers Ms. Wolfe saying that Jack cried all the time and that she felt bad for him because he cried all the time. Ms. Adams spoke to Ms. Wolfe after the incident, and she said that Ms. Wolfe was

very upset and shocked. (4 R. R. 158-161)

Dr. Richard Roberts, pediatric neurosurgeon at Cook Children's Medical Center, treated Jack beginning on April 1, 2010. (4 R. R. 167-69, 180) Jack's condition was compression of the brain. (4 R. R. 181) Dr. Roberts performed a craniotomy and evacuation of a subdural hematoma. This is a procedure designed to get the blood and anything that was causing the shift or increased pressure off the brain and allow the brain to return to its normal state. (4 R. R. 200) When Dr. Roberts opened the dura, he saw a rapid efflux of older-appearing blood. The bleeding was representative of a torn or avulsed vein. (4 R. R. 203) Jack was in a condition which if untreated presented a substantial risk of death. (4 R. R. 212) His condition, as he presented, can result in a protracted loss of some body organ or his brain. (4 R. R. 213) In a case where force is enough to avulse a bridging vein from the sagittal sinus in a normal brain, the injury cause would typically be a car accident or a fall from a second story window. (4 R. R. 218) Dr. Robert's opinion was that more force than was reported occurred to generate these injuries. (4 R. R. 220) His opinion was that this was a non-accidental trauma. Jack had a subdural hematoma with some brain swelling, retinal hemorrhages, and retinal tears, which in Dr. Roberts's opinion did not fit the story of a seven-month-old falling on his back from a seated position. (4 R. R. 227)

Ann Ranelle, D.O., an employee of Fort Worth Eye Associates, consulted

on Jack's case. A trauma nurse at Cook Children's Medical Center requested that she check Jack to see if he had hemorrhages in the eye. (5 R. R. 5-6, 12-13) Dr. Ranelle saw Jack in the pediatric intensive care unit. (5 R. R. 16) During Dr. Ranelle's exam, she didn't see any hemorrhages in his right eye, but did see intra-retinal hemorrhages in his left eye. The hemorrhages were only in the left eye. (5 R. R. 38-39) She found positive results for chemosis, which meant swelling in the conjunctiva of the left eye. Chemosis can happen with traumatic injury. (5 R. R. 42-43) Dr. Ranelle saw multilayered, confluent hemorrhaging in Jack's eye, consistent in her opinion with non-accidental trauma. (5 R. R. 47)

## SUMMARY OF THE ARGUMENT

The Appellant urged due process of law and Texas Rules of Evidence 702 and 705, to complain that the State experts issued the opinion of non-accidental, intentional injury based upon finding subdural hematoma, retinal hemorrhage, and brain swelling. Furthermore, in trial and appeal, the Appellant argued that *given no external, physical signs of trauma or injury to this complainant*, the State experts were improperly calling the injury intentionally inflicted based on the triad of symptoms. Appellant incorporated in her brief the juxtaposition of the state experts—even with this particular child and his old bleed—sticking to their

diagnosis that if a certain constellation of symptoms is present—then, no matter what, the injury is intentional. Therefore, Appellant precisely preserved and argued on appeal whether the abusive head trauma expert testimony should have been admitted—given this injured party and his history.

The trial court abused its discretion by allowing medical expert opinion that shaken baby syndrome (SBS) or its current nomenclature, "abusive head trauma" (AHT)) as support for its findings. The State presented testimony that the child suffered a non-accidental, intentional, head injury; yet, the child displayed no external, physical signs of trauma. There is an ongoing debate supported from multiple sources and studies against the stock opinion that subdural hemorrhage, retinal hemorrhage, and brain swelling in an infant is exclusively AHT.

There is instead disagreement in the medical community regarding the diagnosis of abusive head trauma exclusively based upon subdural hematoma, retinal hemorrhaging, and brain swelling. Against the backdrop that this complainant had two preexisting and undetected old bleeds due to some unestablished cause or causes, the trial court abused its discretion to admit and consider the opinions tied strictly to these markers.

## ARGUMENT

## Ground for Review No. 1:

> Whether the Court of Appeals wrongly decided that the Appellant's point of error that the trial court abused its discretion by admitting unreliable expert testimony of abusive head trauma based solely on a constellation of symptoms did not fairly include the issue whether the expert testimony was unreliable given this specific injured party's history.

Jennifer Banner Wolfe voiced her objection and challenge to the State's experts and their reliance upon the scientific basis and theory of shaken baby syndrome. (4 R. R. 6-8) Ms. Wolfe clarified and the trial court accepted that her challenge to the scientific theory and method she referred to as "shaken baby syndrome , would also refer to "abusive head trauma (AHT)", or "sudden impact injury". (4 R. R. 168) Ms. Wolfe specifically proposed and the trial court agreed and acknowledged that her *Daubert/Kelly* challenge could be heard contemporaneous with the State and Defense presentation of evidence. (4 R. R. 6-8) (8 R. R. 4-5) The trial court ruled that it would hear the case as fact-finder, and also perform the necessary gate-keeping function and rule on Ms. Wolfe's challenge. (4 R. R. 7-8)

At the close of evidence, the trial court carried the *Daubert /Kelly* challenge, in order to have further time to review the materials presented on the issue. Prior to sentencing, the trial court overruled Ms. Wolfe's *Daubert /Kelly* challenge. (8 R. R. 4-5)

In support of her challenge, Ms. Wolfe urged due process of law and Texas Rules of Evidence 702 and 705. (7 R. R. 5) Specifically, Ms. Wolfe complained that the State experts issued the opinion of non-accidental, intentional injury based upon finding subdural hematoma, retinal hemorrhage, and brain swelling. Furthermore, Ms. Wolfe, in trial and appeal, argued that *given no external, physical signs of trauma or injury*, the State experts were improperly calling the injury intentionally inflicted based on the triad of symptoms. (7 R. R. 6-7) Ms. Wolfe argued in essence that the trial court should disregard the State experts' opinions due to the general disagreement and retraction in the medical community that a certain constellation of symptoms was exclusively child abuse. (7 R. R. 10-11)

Citing default, the Court of Appeals declined to review the issue of whether the diagnosis of abusive head trauma could be reliable with respect to Jack, given Jack's prior medical history, including the prior bleeding in his brain. (Opinion, p. 3, n. 3, p. 20-21) The Court of Appeals limited its analysis to "only the general reliability of testimony relating to diagnosing abusive head trauma." (Opinion, p. 21) Even assuming for the sake of argument that the issue was not briefed—that the expert testimony was unreliable *given this injured party's medical history*—the Court of Appeals wrongly determined that the issue of whether the abusive head trauma diagnosis applied to this complainant with his history, was not a

"subsidiary question that is fairly included." TEX. R. APP. P. 38.1(f). The Court of Appeals claimed that Ms. Wolfe did not alternatively argue that the diagnosis of abusive head trauma was unreliable as to this complainant. However, the record below belies the Court of Appeals' foundation for procedural default. Ms. Wolfe did specifically cite the record reference to the "old bleed." (4 R. R. 195, 199, 201, 238) Furthermore, Ms. Wolfe's appellant's brief included the following:

> "According to Dr. Roberts, [the child] must have had another prior hemorrhage, but according to Dr. Roberts the old blood would not have caused the constellation or entirety of the injuries. (4 R.R. 222-23) Dr. Roberts further acknowledged that there were two older bleeds, and both were subdural. (4 R.R. 239-240, 243) On cross-examination, Dr. Roberts unequivocally stated more than once that his opinion that non-accidental trauma (child abuse) occurred was based upon a patient with a subdural hematoma, retinal hemorrhaging, and brain swelling. (4 R.R. 272-73, 280-81)"

So, clearly Ms. Wolfe incorporated in her brief the juxtaposition of the state experts—even with this particular child and his previously undetected old bleeds—sticking to their diagnosis that if a certain constellation of symptoms was present, then, no matter what, the injury is intentional. Therefore, Ms. Wolfe precisely briefed whether the abusive head trauma expert testimony should have been admitted—given this complainant and his medical history.

Moreover, the dissenting Justice believed the issue was "fairly included" in Ms. Wolfe's point of error as presented. The dissent disagreed with the majority,

stating that Ms. Wolfe fairly raised the issue whether the trial court erred to rely upon the state experts' opinions that the injuries sustained by Jack were "non-accidental." (Walker, J., Dissenting Opinion, p. 2)

> Moreover, based on my review of the State's expert testimony, a serious question exists as to the reliability of their conclusion that Jack suffered abusive head trauma. The undisputed evidence at trial established the following: that seven-month-old Jack had experienced at least two prior brain bleeds in his head and did not have a normal, healthy brain at the time he became unconscious at Appellant's home; that according to Jack's preoperative CT scan, the chronic bleeding in Jack's head and the brisk bleeding observed by Dr. Roberts during Jack's surgery were 'side by side'; and that all three of the State's experts concluded that Jack's injuries could not have been caused by shaking alone but required a high-energy impact to Jack's head, yet Jack had no external injuries, marks, bruises, fractures, spinal or neck injuries, or grip marks on his body. All three of the State's experts agreed that when a child with a normal, healthy brain experiences the constellation of subdural hematoma, retinal hemorrhages, and no explanation for the injuries, the typical diagnosis is abusive head trauma. And all three of the State's experts agreed that Jack did not have a normal, healthy brain before he experienced this diagnostic constellation. Yet, all three still opined that despite Jack's already-injured brain, the existence of this diagnostic constellation in Jack meant that Jack's head trauma was intentionally inflicted—abusive head trauma.

(Walker, J., Dissenting Opinion, p. 3-5)

"I write additionally only to point out that serious questions exist regarding the reliability of the experts' opinions as applied to the undisputed facts concerning Jack's unhealthy brain and the lack of any physical injury to Jack."

(Walker, J., Dissenting Opinion, p. 5-6)

If the dissenting opinion author sees the issue, and writes separately to state that the issue was fairly included, then that necessarily meant the subsidiary issue was met the burden of "fairly included."

"The standards of procedural default … are not to be implemented by splitting hairs in the appellate courts." *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992). The Texas Rules of Appellate Procedure require that issues be "construed liberally" and that *every subsidiary question, which is fairly included, must be addressed. State v. Bailey*, 201 S.W.3d 739, 743-44 (Tex. Crim. App. 2006); TEX. R. APP. P. 38.1(f). An appellant's brief must contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). According to TEX. R. APP. P. 38.1(f), the statement of an issue or point will be treated as covering every subsidiary question that is fairly included.

An appellate court may not reverse a trial court "'on a theory that the trial court did not have the opportunity to rule upon and upon which the non-appealing party did not have an opportunity to develop a complete factual record." *Id.* at 743, *quoting Hailey v. State*, 87 S.W.3d 118, 122 (Tex. Crim. App. 2002). Procedural default rests on the basic principle of appellate jurisprudence that points not argued at trial are deemed to be waived. *State v. Mercado*, 972 S.W.2d 75, 78 (Tex. Crim. App. 1998). This Court explained a two-fold purpose behind

this principle: (1) To inform the trial judge of the basis of the party's argument and afford him an opportunity to respond to that argument, and (2) to give opposing counsel the opportunity to respond to that argument. *State v. Copeland*, 2014 Tex. Crim. App. Unpub. LEXIS 929, No. PD-1802-13 (Tex. Crim. App. 2014) (not designated for publication). The Texas Supreme Court opined as follows: "Appellate briefs are to be construed liberally, so that the right to appellate review is not lost by waiver. Simply put, appellate courts should reach the merits of an appeal whenever reasonably possible." *Perry v. Cohen*, 272 S.W.2d 585, 587 (Tex. 2008).

In the record below, the State clearly had ample opportunity and actually did develop its evidence and respond to the Appellant's argument regarding the expert testimony. In *State v. Bailey*, above, appellant who was charged with violations of the Texas Securities Act claimed on appeal that the certificates of deposits at issue were not securities under the Act as a matter of law. The appellant sought a trial court ruling on that issue. On appeal, the Eighth Court of Appeals re-framed the appellant's complaint finding that the trial court erred in not charging the jury to determine of whether or not a certificate of deposit is a security. *Id*. at 740. This Court granted review and determined that the Court of Appeals committed error when it addressed an issue not presented to the trial court or raised by the parties on appeal. *Id*. at 742. This Court held that the Court of Appeals reformulated the

14 | **Jennifer Banner Wolfe v. State, Appellant's brief**

issue to be that the trial court erred in charging the jury that the CDs were securities and reversing on those grounds. This Court found that the issue of who should make the determination of whether CDs qualify as securities is clearly separate from whether the trial judge, in response to the agreement of the parties, erred in deciding that the CDs were securities as a matter of law. *Id.* at 743. This Court acknowledged that T.R.A.P. 38.9(b) instructs that briefing rules are to be construed liberally, and gives the appellate courts some discretion in remedying substantive defects in parties' briefs, but it does not allow the court of appeals to "reach out and reverse the trial court on an issue that was not raised." *Id.* at 744.

As the dissent recognized in this case, Ms. Wolfe's brief did not require nor invite the Court of Appeals to "reach out" and create an issue on which to reverse. The Appellant's Brief squarely raised the issue whether this expert testimony in this case with this complainant—was reliable in its conclusion that there was intentional head trauma. In its Brief, the State never argued that this issue was defaulted, yet the Court of Appeals "reached out" and found default.

## Ground for Review No. 2:

> Whether the Court of Appeals wrongly decided that the trial court did not abuse its discretion by admitting unreliable expert testimony of abusive head trauma based solely on a constellation of symptoms.

Before testimony began, Jennifer Banner Wolfe voiced her objection and challenge to the State's experts and their reliance upon the scientific basis and theory of shaken baby syndrome. (4 R. R. 6-8) Ms. Wolfe clarified and the trial court accepted that her challenge to the scientific theory and method she referred to as "shaken baby syndrome (SBS)," would also incorporate the affiliated terms, "abusive head trauma" (AHT), or "sudden impact injury". (4 R. R. 168) Ms. Wolfe complained that the State experts based their opinion of non-accidental, intentional injury exclusively upon finding subdural hematoma, retinal hemorrhage, and brain swelling, without regard to the child's prior undetected old bleeds. Also, given no external, physical signs of trauma or injury, the State experts' myopic "medical diagnosis" of abuse was unreliable. (7 R. R. 6-7) Ms. Wolfe complained in essence that the trial court should not rely upon the State experts' opinions due to the general disagreement and retraction in the medical community that a certain constellation of symptoms was exclusively child abuse. (7 R. R. 10-11)

In this record, without a shred of external damage, and no mark, bruise, or any other physical sign of impact, the State experts bootstrap that an impact occurred, and opined that Jack's head trauma was intentional. Thus, the past discredited science due to concluding head trauma was intentional in SBS without any sign of external injury is germane to the point. This trial court was told—and

the Court of Appeals was equally enthralled by—the assumption that an *intentional impact* must have occurred, based on the same triad of symptoms that are not sustainable to support SBS.

Ms. Wolfe presented to the trial court a peer-reviewed medical opinion evidence (9 R. R.: *Defense Exhibit 15*) with the following relevant conclusion: "It appears that the weight of evidence, bold old and new, suggests that increased ICP is a valid, common and predictable cause of RH (retinal hemorrhage) and that human shaking, by itself, in a healthy child, is insufficient to cause this. Furthermore, children with perinatal SDH (subdural hematoma), *or pre-existing SDH of any cause, are prone to re-bleed, resulting in episodes of increased ICP (increased intracranial pressure), new RH and more symptoms, which may occur with minimal force applied to the head or with normal handling.*" Steven C. Gabaeff, M.D., *Challenging the Pathophysiologic Connection between Subdural Hematoma, Retinal Hemorrhage and Shaken Baby Syndrome*, West J Emerg. Med. 2011; 12(2) May 144-158. (emphasis added)

"IDH (intradural hemorrhage) can occur in response to a variety of primary insults. However, if a child has a preexisting SDH (subdural hematoma) of any etiology, and chronic SDH has developed, shaking or even normal handling can result in spontaneous re-bleeding of the previous SDH (subacute or chronic SDH). Vinchon et al (Vinchon M, Delestret I, DeFoort-Dhellemmes S, et al. *Subdural*

*Hematoma in Infants: Can It Occur Spontaneously? Data From a Prospective Series and Critical Review of the Literature*: Child Nerv. Syst. 2010) in 2010 found 10% of all SDH cases over a three year period at his institution (16 children total) had spontaneous re-bleeds without evidence of abuse. *Again the distinction between the previously healthy child and the previously damaged child must be made*." *Id.* (emphasis added)

"As has been noted, some examples of 'contradicted scientific evidence relied upon by the state at trial' included arson, *infant trauma*, bullet-lead analysis, bite marks, some ballistics tests, blood splatter patterns, and scent line-ups." *Ex parte Robbins,* 2014 Tex. Crim. App. LEXIS 2014 (Tex. Crim. App., November 26, 2014) (Johnson, J., concurring), *rehearing granted, In re Robbins*, 2015 Tex. Crim. App. LEXIS 567 (Tex. Crim. App., May 13, 2015).

The State called Dr. Richard Roberts who opined that in his medical opinion, the retinal hemorrhage combined with the tearing of the retina, and combined with the avulsion of the bridging vein, were classically associated with high-energy input to the head. (4 R. R. 203, 220) He based his opinion on the presence of subdural hematoma with some brain swelling, retinal hemorrhages, and also retinal tearing. (4 R. R. 227)

Dr. Roberts also noted from the CT scans a chronic, or "old bleed". (4 R.R. 195, 199, 201, 238) According to Dr. Roberts, Jack must have had another prior

hemorrhage, but according to Dr. Roberts the old blood would not have caused the constellation or entirety of the injuries. (4 R.R. 222-23) Dr. Roberts further acknowledged that there were two older bleeds, and both were subdural. (4 R.R. 239-240, 243) On cross-examination, Dr. Roberts unequivocally stated more than once that his opinion that non-accidental trauma (child abuse) occurred was based upon a patient with a subdural hematoma, retinal hemorrhaging, and brain swelling. (4 R.R. 272-73, 280-81) However, Dr. Roberts agreed on cross-examination that because of Jack's prior brain bleeds, "we are not talking about a healthy brain." (4 R. R. 243)

The State also called Dr. Ann Ranelle, with Fort Worth Eye Associates, who testified that Jack was referred for non-accidental trauma, and she examined him for hemorrhages in his eyes. (5 R. R. 13) As to the unilateral hemorrhaging, Dr. Ranelle candidly stated that it is seen in non-accidental trauma, and "nobody has ever said to me a reason why it's – there's just – there's nobody who can come up with anything that describes this amount of traumatic injury to the eye." (5 R. R. 55) Dr. Ranelle acknowledged on cross-examination that given the prior bleeds, Jack was not a "completely healthy child." (5 R. R. 88)

The State called Dr. Jayme Coffman, CARE Team medical director at Cook Children's Medical Center. Dr. Coffman testified that the avulsed or torn bridging vein had to be from trauma. (6 R.R. 95-96) She also testified that the

19 | **Jennifer Banner Wolfe v. State, Appellant's brief**

retinoschisis, observed by Dr. Ranelle, is "only seen in trauma", but for "one case of leukemia." (6 R.R. 96) Ultimately, Dr. Coffman opined that in this case there had to be "impact or shaking and impact." (6 R.R. 105) Dr. Coffman explained away the lack of external injuries circumstantially as impact on something "padded". (6 R.R. 105-106) Regarding any current scientific discussion or uncertainty, Dr. Coffman claimed that there is "no unrest" in the pediatric world or the pediatric ophthalmology world or the pediatric neurosurgery world, only in the medical examiner or biomechanical world.[2] (6 R.R. 108)

A trial court's decision to admit expert testimony is reviewed for abuse of discretion. *Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Id*. Concerning the admissibility of expert testimony, Texas Rule of Evidence 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." The

---

[2] Dr. Coffman's claim is unsubstantiated given Justice Ginsberg dissent in *11 v. Smith*, 132 S.Ct. 2 (2011), and given that the Court of Criminal Appeals recently recognized the current debate in pediatric head trauma. *See Ex parte Henderson*, 384 S.W.3d 833, 834 (Tex. Crim. App. 2012).

proponent of the scientific evidence must show, by clear and convincing proof, that the evidence is sufficiently relevant and reliable to assist the jury in accurately understanding other evidence or in determining a fact in issue. *Gallo v. State*, 239 S.W.3d 757, 765 (Tex. Crim. App. 2007), *cert denied*, 128 S. Ct. 2872 (2008).

The legal proposition that scientific evidence must be "reliable" in theory and application, and the consequent correlation to fairness in prosecutions, cannot be overstated. To underscore, as of January 2015, there have been 325 post-conviction DNA exonerations in U. S. history. *DNA Exoneree Case Profiles*, INNOCENCE PROJECT, http://innocenceproject.org/know/. In a 2009 study on the first 232 exonerees, 156 men and women were identified as having trials in which forensic evidence was presented. Brandon J. Garrett & Peter J. Neufeld, *Invalid Forensic Science Testimony and Wrongful Convictions*, 95 VA. L. REV. 1, 12 (2009). "An examination of the trial transcripts from 137 of those cases revealed that 60% of the cases involved inaccurate forensic science testimony." Sabra Thomas, *Addressing Wrongful Convictions: An Examination of Texas's New Junk Science Writ and Other Measures for Protecting the Innocent*, 52 Hous. L. Rev. 1037, 1038 (Winter 2015). "The Innocence Project, a national organization dedicated to exonerating the wrongfully convicted, estimates that DNA testing is not an option in 90% to 95% of criminal cases due to a lack of biological evidence

that can be subjected to testing." *Id.* There is no relevant DNA issue to later correct any specious scientific conclusions used against Ms. Wolfe.

An Abusive Head Trauma (AHT) determination, just as Shaken Baby Syndrome (SBS), is unique in prosecution because it relies upon three diagnostic symptoms comprising the classic "triad" of symptoms: retinal hemorrhages; subdural hemorrhages; and cerebral edema (brain swelling). According to the State experts' views in this case, this triad of physical findings was pathognomonic (i.e., diagnostic of to the exclusion of other causes) for non-accidental trauma. Their opinions were unreliable in part because there is far too much documented retraction in the medical community associated with SBS relative to this same classic triad of symptoms.

"Unlike any other category of prosecution, all elements of the crime—*mens rea and actus rea* (which includes both the act itself and causation of the resulting harm)—are proven by science. Degree of force testimony not only establishes causation but also the requisite state of mind." Deborah Tuerkheimer, *The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts,* 87 WASH. L. REV. 5 (2009).

This Court granted relief and vacated a death sentence in *Ex parte Henderson*, 384 S.W.3d 833, 833-34 (Tex. Crim. App. 2012). *Henderson* involved an infant death where the applicant claimed at trial that the infant fell

from her arms to the concrete floor, a distance of approximately four-and-one-half feet. At trial the medical examiner, Dr. Roberto Bayardo, strenuously disagreed that the infant's death could have been accidental. Dr. Bayardo testified that "it would have been impossible" for an accidental fall to produce the injuries sustained by the infant. Dr. Bayardo testified "unequivocally" at trial that the three-and-a-half-month-old child "came to his death as a result of a severe closed head injury…characteristic of abuse, homicide." *Id.* However, since the time of trial, Dr. Bayardo changed his mind based upon "*advances in the science of pediatric head trauma.*" *Id.* (emphasis added) Dr. Bayardo declared that, based upon the physical evidence, he could not determine with a reasonable degree of medical certainty whether the child's injuries resulted from an intentional act or an accidental fall. *Id.*

Dr. Bayardo further recanted that "because of recent scientific knowledge" about how head injuries occur, he no longer believed if the injuries were from an accidental fall, it would be the result of a fall from a height of over two stories. He changed his manner of death finding from homicide to "undetermined". The applicant in *Henderson* also called two experts in biomechanical engineering who both testified, "The application of biomechanics to the study of pediatric head trauma and the medical community's recognition of the role of biomechanics in determining causes of injury *are recent and still developing.*" *Id.* (emphasis

added)

Judge Cochran also cited the testimony of pediatric forensic pathologist and medical examiner, Dr. Ophoven, who described a 'pendulum swing' in the medical community with respect to pediatric injuries. "Now, with studies applying biomechanics to the field of pediatric head injuries, doctors are more cautious about 'ruling out' the possibility that a child's head injury occurred accidentally." *Id.*

The expert in *Henderson* changed his opinion "based on medical advances", and based "upon advances in the science of pediatric head trauma." *Id.*, 384 S.W.3d at 834.

In *Ex parte Robbins*, 360 S.W.3d 446 (Tex. Crim. App. 2011), *cert denied*, 2012 U.S. LEXIS 3468 (U. S., May 14, 2012), habeas relief in a capital case was denied. At trial, the medical examiner ruled the death caused by asphyxiation by compression and the manner of death was homicide. At some point post-conviction, the deputy chief medical examiner re-evaluated the autopsy findings and changed the ruling from homicide to undetermined. The medical examiner that performed the autopsy agreed with the change and explained that since her original opinion she had more experience and had reviewed additional information. Her opinion changed to manner of death of undetermined. *Id.*

In the dissenting opinion, Judge Cochran expressed her legitimate concern

for convictions that rest upon specious forensic science. *Id*., (Cochran, J., dissenting). Judge Cochran, joined by two other judges, relied in part upon the NATIONAL ACADEMY OF SCIENCES STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD 112 (2009) ("NAS Report), note 4; Daniel G. Orenstein, *Comment: Shaken to the Core: Emerging Scientific Opinion and Post-Conviction Relief in Cases of Shaken Baby Syndrome*, 42 ARIZ. ST. L.J. 1305 (2010) (arguing that the criminal justice system must be prepared to reexamine cases in which the conviction, was based entirely or principally, on unsettled science when the science evolves substantially enough to undermine confidence in a verdict).

Judge Cochran also made the somewhat poignant comparison to an arson-murder case in which the experts at trial were confident that the fire that killed the victim was set intentionally, but later experts reviewed the evidence and science and could not determine whether the fire was arson or not. It was a fire of undetermined and undeterminable origin and not capable of being scientifically determined as arson or accidental. *Ex parte Robbins*, 360 S.W.3d at 469, (Cochran, J., dissenting).

In the *Daubert/Kelly* hearing Ms. Wolfe directed the trial court's attention (7 R. R. 8-9) to an overturned conviction in *State v. Edmunds*, 746 N.W.2d 590 (Wis. Ct. App. 2008), *rev. denied*, 749 N.W.2d 663 (Wis. 2008). A jury convicted

Edmunds on the basis of expert testimony that the child died as a result of Shaken Baby Syndrome (SBS). The state experts testified that only shaking, possibly accompanied by impact could explain the injuries. Ms. Edmunds filed her motion for new trial in 2006, asserting that there were significant developments in the medical community around "shaken baby syndrome" in the ten years since her trial. The appeals court granted Ms. Edmunds a new trial due to a "shift in mainstream medical opinion." *Id.*, 746 N.W.2d at 598-99. The *Edmunds* Court was persuaded that "the emergence of a legitimate and significant dispute within the medical community" and "medical developments and literature" in the ten years since her trial provided new evidence that created a reasonable probability that a different result would be reached in a new trial. *Id.*

The New Mexico Supreme Court reversed a child abuse conviction due to ineffective counsel assistance where counsel was denied funds for a defense expert to challenge the state expert's opinion that the child suffered intentional abuse. *State v. Schoonmaker*, 176 P.3d 1105 (N. M. 2008), *overruled in part*, 332 P.3d 850 (N. M. 2014). The appellant contended the child had been injured after falling from a couch, combined with the child's medical history including premature birth and subsequent hospitalization. In *Schoonmaker* the state presented no external evidence of shaking such as a neck injury or 'gripping' injuries. The case is notable because the New Mexico Supreme Court specifically acknowledged the

"disagreement" in the medical community as to the amount of time between when injuries occur and when the child becomes symptomatic, and "whether injuries like Child's can be caused by short-distance falls, particularly in light of Child's medical history." *Id.* at 1114.

Also noteworthy—given the complete absence of any physical sign of external injury to Jack—is the significance of Justice Ginsberg's mention of multiple sources all pointing to the consensus that the commonly held opinion that subdural hemorrhage and retinal hemorrhage in an infant was strong evidence of SBS was unsustainable. *Cavazos v. Smith*, 132 S.Ct. 2 (2011) (Ginsberg, J., dissenting); *See* Bandak, *Shaken Baby Syndrome: A Biomechanics Analysis of Injury Mechanisms*, 151 Forensic Sci. Int'l 71, 78 (2005) ("'Head acceleration and velocity levels commonly reported for SBS generate forces that are far too great for the infant neck to withstand without injury ….[A]n SBS diagnosis in an infant …without cervical spine or brain stem injury is questionable and other causes of the intracerebral injury must be considered.'"); Minns, *Shaken Baby Syndrome: Theoretical and Evidential Controversies*, 35 J. Royal College of Physicians of Edinburgh 5, 10 (2005) ("'[D]iagnosing 'shaking' as a mechanism of injury …is not possible, because these are unwitnessed injuries that may be incurred by a whole variety of mechanisms solely or in combination.'"); Uscinski, *Shaken Baby Syndrome: An Odyssey*, 46 Neurol. Med. Chr. (Tokyo) 57, 59 (2006) ("'[T]he

hypothetical mechanism of manually shaking infants in such a way as to cause intracranial injury is based on a misinterpretation of an experiment done for a different purpose, and contrary to the laws of injury biomechanics as they apply specifically to the infant anatomy.'") *Cavazos v. Smith*, 132 S.Ct. 2 (2011) (Ginsberg, J., dissenting).

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully prays that the Court of Criminal Appeals reverse the judgment of the Court of Appeals and remand this case for a new trial; or, in the alternative, remand this case to the Court of Appeals for full consideration of the merits of whether the trial court abused its discretion by admitting unreliable expert testimony on abusive head trauma, and for such other relief as she may show herself deserving at law or in equity.

Respectfully submitted,

DAVID A. PEARSON, P.L.L.C.

By: _____
David A. Pearson, IV

Attorney for Appellant
222 W. Exchange Ave., Ste. 103
Fort Worth, Texas 76164
(817) 625-8081
FAX (817) 625-8038
State of Texas Bar Card
Number 15690465
*david@lawbydap.com*

## CERTIFICATE OF SERVICE

I hereby certify that upon submission for filing a true and correct copy of the foregoing APPELLANT'S BRIEF was e-served to Hon. Tanya S. Dohoney, Assistant District Attorney, Tarrant County District Attorney's Office at CCAAppellateAlerts@TarrantCounty.com and was e-served to Hon. Lisa C. McMinn, State Prosecuting Attorney at information@spa.texas.gov, and a file-stamped copy will be served by U.S. mail to the Appellant, Jennifer Banner Wolfe, TDCJ#01776755, Lockhart Work Facility, P.O. Box 1170, Lockhart, TX 78644.

David A. Pearson, IV

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with Texas Rule of Appellate Procedure 9.4( e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document complies with Texas Rule of Appellate Procedure 9.4 (i)(1)and (2)(B), containing 7,558 words, including the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and appendix. Signed on this the 2 November 2015.

David A. Pearson, IV